**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

United States of America ex. rel.                )
                                                 )
**JOHNNIE PLUMMER**, Reg. No. K-65650)
          Menard Correctional Center             )
          711 Kaskaskia Street                   )
          P.O. Box 711                           )
          Menard, Illinois 62259                 )
                                                 )
PETITIONER                                       )
                                                 )
          vs.                                    )
                                                 )
**DAVE REDNOUR**,                                )
Warden, Menard Correctional Center               )
                                                 )
RESPONDENT                                       )
                                                 )
                                                 )
                                                 )
                                                 )
                                                 )

C.   1:10-cv-06225
     Judge Harry D. Leinenweber
     Magistrate Judge Jeffrey Cole

Case Number of State Court Conviction:
Cook Co. Circuit Court Gen. No.
          91 CR 21451


### PETITION FOR WRIT OF HABEAS CORPUS - PERSON IN STATE CUSTODY

1.     Name and location of court where conviction entered:

**Circuit Court of Cook County, Illinois**

**Criminal Court Building, 2600 S. California Ave., Chicago, IL 60608**

2.     Date of judgment of conviction:     **June 29, 1995**

3.     Offense(s) of which petitioner was convicted (list all counts with indictment numbers, if
       known):

**First Degree Murder (Count 1), Attempt First Degree Murder (Count 3), and Aggravated
Battery with a Firearm (Count 4). All of the convictions were entered under Indictment**

**No. 91 CR 21451.**

4.  Sentences imposed:

**Plummer was sentenced to a term of 50 years for First Degree Murder, to a term of 25 years for Attempt First Degree Murder, and to a term of 25 years for Aggravated Battery with a Firearm.  All of the sentences were ordered to run concurrently.**

5.  What was your plea?  (Check one)      (A)  Not Guilty      **(X)**
                                          (B)  Guilty          (  )
                                          (C)  Nolo Contendre  (  )

   If you pleaded guilty to one count or indictment and not guilty to another count or indictment, give details:

**Does not apply.**

## PART I - TRIAL AND DIRECT REVIEW

1. Kind of trial: (Check one)      Jury ( )      Judge Only (**X**)

2. Did you testify at trial?      YES ( )      NO (**X**)

3. Did you appeal from the conviction or the sentence imposed?    YES (**X**)   NO ( )

    (A)    If you appealed, give the

        (1)    Name of court:    **Appellate Court of Illinois, First Judicial District**

        (2)    Result:    **conviction and sentence affirmed**

        (3)    Date of ruling:    **July 29, 1999**

        (4)    Issues raised:

**(1)    Where Johnny Plummer was denied access to his mother or family, or any adult interested in his welfare, and where there was psychological evidence that Plummer was susceptible to influence, the trial court erred in denying Plummer's motion to suppress statements.**

    (B)    If you did not appeal, explain briefly why not:

**Does not apply.**

4. Did you appeal, or seek leave to appeal, to the highest state court?  YES (**X**)   NO ( )

    (A)    If yes, give the

        (1)    Result:    **The Supreme Court of Illinois denied leave to appeal.**

        (2)    Date of ruling: **October 6, 1999.**

        (3)    Issues Raised:

**(1)    Because, contrary to his statutory and constitutional obligations to protect the rights and interests of the minor, the youth officer abandoned his function of acting on behalf of Petitioner during his custodial interrogation, this court should accept this cause and determine the expected duties of a juvenile officer, concluding the inaction of the youth officer here rendered the statement by Petitioner involuntary.**

(B)     If no, why not:

**Does not apply.**

5.     Did you petition the United States Supreme Court for a writ of *certiorari*? Yes (**X**) No ( )

If yes, give (A) date of petition: **December 3, 1999**  (B) date *certiorari* was denied: **February 22, 2000**

## PART II – COLLATERAL PROCEEDINGS

1. With respect to this conviction or sentence, have you filed a post-conviction petition in state court?

   YES (**X**)    NO ( )

   With respect to each post-conviction petition, give the following information (use additional sheets if necessary):

A. Name of Court:    **Circuit Court of Cook County, Illinois**

B. Date of Filing:    **August 22, 1996 (per mail-box rule); File-stamped September 4, 1996**

C. Issues Raised:

**(1)    Police officers physically and psychologically abused Plummer to extract his statements.**

**(2)    Trial counsel was ineffective for failure to call various witnesses, including the arresting officers and a civilian who witnessed an officer striking Plummer.**

**(3)    Trial counsel was ineffective for failing to introduce Plummer's grades and reading scores, which would have shown poor comprehension and supported his motion to suppress.**

**(4)    Trial counsel failed to challenge Plummer's lineup identification on the grounds that the lineup was overly suggestive and was conducted without affording 15-year-old Plummer the opportunity to confer with counsel or a guardian.**

**(5)    The trial court failed to properly address Plummer's post-trial complaints of trial counsel's ineffectiveness.**

**(6)    Trial counsel was ineffective for failing to impeach the State's identification witness with her prior descriptions of the offender.**

D. Did you receive an evidentiary hearing on your petition?    YES ( )    NO (**X**)

E. What was the court's ruling:

**The court dismissed the petition without an evidentiary hearing, ruling that the petition failed to make a substantial showing that Plummer's constitutional rights were violated.**

F.      Date of court's ruling:          **December 13, 2000**

G.      Did you appeal from the ruling on your petition?      YES (**X**)      NO ( )

H.      (a)     If yes, (1) what was the result?

**The Appellate Court of Illinois reversed the dismissal of the post-conviction petition and remanded the cause for further proceedings under the state Post Conviction Hearing Act.**

                (2) date of decision: **December 31, 2003**

        (b)     If no, explain briefly why not:

**Does not apply.**

I.      Did you appeal, or seek leave to appeal this decision to the highest state court?

        YES ( )      NO (**X**)

        (a)     If yes, (1) what was the result?      **Does not apply.**

                (2) date of decision:      **Does not apply.**

        (b)     If no, explain briefly why not:

**The intermediate appellate court granted relief in the form of remand for further post-conviction proceedings.  On remand, Plummer was again denied State post-conviction relief when the circuit court again dismissed his petition without an evidentiary hearing. Plummer again appealed to the Appellate Court of Illinois, as described below.**

        (1)     Name of court:        **Appellate Court of Illinois, First Judicial District**

        (2)     Result:               **The appellate court affirmed the dismissal of the petition without an evidentiary hearing.**

        (3)     Date of ruling:       **June 10, 2009**

        (4)     Issues raised:

**(1)     Johnnie Plummer's post-conviction counsel labored under a conflict of interest**

where she was assigned to represent him on remand after the appellate court had deemed her previous representation of Plummer legally unreasonable. Assignment of the case to the same lawyer on remand placed her in the position of trying to both represent Plummer and to protect her own reputation.

(2)     Johnnie Plummer was denied reasonable assistance of post-conviction counsel where counsel failed to make necessary amendments to Plummer's *pro se* post-conviction petition, failed to append any supporting documentation to his petition, failed to draw the judge's attention to Plummer's fitness claim, and presented no substantive argument at the motion to dismiss.

(3)     The trial court erred in dismissing Johnnie Plummer's post-conviction petition where that petition made a substantial showing that his trial counsel was ineffective for failing to obtain and introduce a supplemental police report that would have directly contradicted the testimony of Detective Michael Kill.

(4)     The trial court deprived Plummer of due process of law where, after agreeing to hold a fitness hearing to resolve a *bona fide* doubt as to Plummer's fitness to stand trial, it failed to hold that hearing.

(5)     The appellate court should re-examine Plummer's claim that his statement was involuntary where its December 31, 2003 order held that the claim was barred by *res judicata*, yet failed to address the well-settled exception to *res judicata* that exists where the law has changed.

What was the result:

The Appellate Court affirmed the circuit court's dismissal of Plummer's post-conviction petition without an evidentiary hearing.

Date of Decision:     **June 10, 2009**

Did you appeal, or seek leave to appeal this decision to the highest state court?

YES (**X**)      NO ( )

If yes, (1) what was the result?     **The Supreme Court of Illinois denied leave to appeal.**

(2) date of decision:     **September 30, 2009**

In addition, Plummer tried to file a supplemental petition for leave to appeal by mailing the document to the Clerk of the Supreme Court of Illinois. The Clerk returned the document

to Plummer without filing it, advising him that, because he was represented by counsel, the Clerk could not accept his *pro se* supplement.

2.      With respect to this conviction or sentence, have you filed a petition in state court using any other form of post-conviction procedure, such as *corum nobis* or habeas corpus?

      YES (**X**)     NO ( )

      A.      If yes, give the following information with respect to each proceeding (using separate sheets if necessary):

            1.      Nature of proceeding:

**Plummer filed two state habeas petitions.**

            2.      Date petition filed:    **October 27, 2003 and January 20, 2004.**

            3.      Ruling on the petition:

**It appears that the circuit court treated those pleadings as if they were supplemental post-conviction petitions filed under the Post-Conviction Hearing Act, and dismissed them on April 4, 2006, along with Plummer's post-conviction pleadings filed in this case.**

            4.      Date of ruling:    **April 4, 2006.**

            5.      If you appealed, what was the ruling on appeal?

**Does not apply.**

            6.      Date of ruling on appeal:

**Does not apply.**

            7.      If there was a further appeal, what was the ruling?

**Does not apply.**

            8.      Date of ruling on appeal:

**Does not apply.**

3.      With respect to this conviction or sentence, have you filed a previous petition for habeas

corpus in **federal court**?

YES ( )　　NO (**X**)

    A.　　If yes, give the name of the court, case title and case number:

**Does not apply.**

    B.　　Did the court rule on your petition?  Is so, state

        (1)　　Ruling:

**Does not apply.**

        (2)　　Date:

**Does not apply.**

4.　　With respect to this conviction or sentence, are there legal proceedings pending in any court, other than this petition?　　YES ( )　　NO (**X**)

    If yes, explain:

## PART III - PETITIONER'S CLAIMS

1.  State <u>briefly</u> every ground on which you claim that you are being held unlawfully. Summarize <u>briefly</u> the <u>facts</u> supporting each ground. You may attach additional pages stating additional grounds and supporting facts. If you fail to set forth all grounds in this petition, you may be barred from presenting additional grounds later.

**BEFORE PROCEEDING IN THE FEDERAL COURT, YOU MUST ORDINARILY FIRST EXHAUST YOUR STATE COURT REMEDIES WITH RESPECT TO EACH GROUND FOR RELIEF ASSERTED.**

### Statement of Facts

1.  On June 29, 1995, Johnnie Plummer was convicted of first degree murder for the August 11, 1991 killing of Michael Engram. (Tr. R.II F25; Tr. C. 64).[1] He was also convicted of attempt murder and aggravated battery with a firearm against D'Andre Dyson, both of which occurred in the same August 11, 1991 shooting which resulted in Engram's death. (Tr. R.II F25; Tr. C. 64; Tr. S.R.II C17). Plummer was fifteen years old at the time of the incident and at the time of his arrest. (Tr. R.I B34; Tr. C. 68).

### Motion to Quash Arrest and Suppress Evidence/Motion to Suppress Statements

2.  Plummer filed pre-trial motions to quash his arrest and suppress resulting evidence and to suppress statements he made to police officers and a prosecutor concerning the

---

[1]     The record from the post-conviction remand consists of four volumes, including a three-volume common-law record and a one-volume report of proceedings. This brief designates the common-law record from remand as "Rem. C.," "Rem. Supp. I," and "Rem. Supp. II," and the report of proceedings from remand as "Rem. R."

The post-conviction record on appeal consists of three volumes, including a two-volume common-law record and a one-volume report of proceedings. This brief designates the post-conviction common law record as "P.C. C." and the report of proceedings as "P.C. R."

The record on direct appeal is quoted at length as well. It consists of five volumes, including a one-volume common law record, a two-volume report of proceedings, and a two-volume supplemental record. This brief designates the direct appeal common law record as "Tr. C.," the direct appeal report of proceedings as "Tr. R.I" and "Tr. R.II," and the direct appeal supplemental records as "Tr. S.R.I" and "Tr. S.R.II."

Engram killing. (Tr. C. 42, 54). The motions alleged, among other things, that police had no probable cause to arrest Plummer; that Plummer was not informed of his *Miranda* rights, that police officers beat him and otherwise coerced Plummer into confessing; that Plummer's police statements were obtained after he had invoked his right to remain silent and asked for an attorney; and that Plummer was incapable of knowingly and understandingly waiving his *Miranda* rights. (Tr. C. 42-46, 52-56). Plummer sought suppression of his statements, of a line-up identification, and of all other evidence obtained as a result of his arrest and interrogation. (Tr. C. 42, 52-56). The trial court heard the motions at a joint hearing. (Tr. S.R.I A3-4). At the hearing, the State presented the following evidence.

   3.   Plummer witnessed the unrelated killing of Anthony Phillips, which occurred on August 18, 1991 at approximately 12:30 a.m. Detective Michael Kill and his partner were assigned to investigate the Phillips murder. (Tr. R.I A5). Around 6:30 p.m. on August 18, 1991, Kill learned that Plummer was an eyewitness to the Phillips shooting. (Tr. R.I A19). Kill talked with Plummer for approximately four hours to determine what he knew about the shooting. (Tr. R.I A22, 26). Plummer gave Kill the name of the shooter and reenacted the events for Kill. (Tr. R.I A26). With the exception of going to get food, they stayed in the vicinity of the Phillips shooting for the entire four-hour conversation. (Tr. R.I A26). Plummer was not a suspect in the Phillips shooting. (Tr. R.I A22, 26-27).

   4.   Kill returned to the area of the Phillips shooting around 3:30 in the morning on August 19, 1991. (Tr. R.I A6). There he spoke with two other eyewitnesses to the Phillips shooting. (Tr. R.I A6). The boys agreed to go to the Area Three police station with Kill and his partner to talk more about the Phillips shooting. (Tr. R. I A6). As the boys were getting into

Kill's car, Kill saw Plummer walking toward him. (Tr. R.I A7, 28). He asked Plummer to come to the station to clear up minor inconsistencies in the three boys' stories, and Plummer agreed. (Tr. R.I A8, 29). Plummer got into the car, and they drove to 5708 South Marshfield, where, according to Kill, Kill told a woman who identified herself as Plummer's mother that Plummer had agreed to go to Area Three with him to assist with the Phillips murder investigation. (Tr. R.I A8, 31).

5.      They arrived at the station around 4:00 a.m. on August 19th, and Kill put the boys in separate rooms on the third floor. (Tr. R.I A9, 31). Kill spoke with each boy, talking with Plummer last. (Tr. R.I A1, 31). Kill talked with Plummer around 6:00 a.m on August 19th; his partner was in the room. (Tr. R.I A10, 31). The conversation lasted for approximately half an hour and Kill then left the station. (Tr. R.I A11). Before leaving, Kill asked Plummer and the other boys to remain at the station so they could identify the shooter. (Tr. R.I A12). Kill said he had no further contact with Plummer that day (Tr. R.I A12), and that he did not return to the station until 4:30 p.m. August 21, 1991 (Tr. R.I A35).

6.      On cross examination, defense counsel tried to contradict Kill's denial that he was assigned to or involved in the investigation of the Engram case. (Tr. R. I. A-36-37). Counsel asked Kill if he was aware that he was listed as one of the arresting officers in this case. (Tr. R. I. A-40, Tr. C. 17). Kill responded that his name was erroneously on the arrest report. (Tr. R. I. A-41, Tr. C. 17). Kill told defense counsel that the "actual arresting officers" would be listed on the supplemental report. (Tr. R. I. A-41). Defense counsel never obtained the supplemental report. Plummer obtained the supplemental report on post-conviction review, and the supplemental report indicates that Kill was one of the "personnel assigned" to this case. (Rem. C. 80)

7. Detective John Halloran testified at the suppression hearing that he and his partner were working at the Area Three station on the morning of August 19, 1991. (Tr. R.I A53). Halloran learned that Plummer and two other boys were in the station for the Phillips murder investigation. (Tr. R.I A54). At approximately 10:00 that morning, Halloran talked with Plummer and the other witnesses in the station. (Tr. R.I A55-56). His partner was present for the half-hour conversation with Plummer. (Tr. R.I A55-56). Halloran learned the name of the Phillips shooter and of other potential witnesses. (Tr. R.I A56).

8. Halloran got food for the three boys and left the station at approximately 1:00 p.m. (Tr. R.I A57). Before leaving, Halloran told Plummer and the other boys that he was leaving to attempt to locate the suspects. (Tr. R.I A57). He told the boys that he could take them home but that they would have to come back to the station to identify the suspects. (Tr. R.I A57). Halloran testified that Plummer and the others willingly remained at the station. (Tr. R.I A58). Halloran instructed Plummer to stay in the interrogation room and not to roam around the station. (Tr. R.I A69-71). Halloran returned to the station at approximately 3:00 p.m. (Tr. R.I A58).

9. At approximately 4:00 that afternoon (August 19th), Halloran had a brief conversation with Detective Stanley Turner. (Tr. R.I A58, 60-61). Turner asked Halloran whether he knew the identity of a person from the area of 59th and Union who went by the name Smokey. (Tr. R.I A59). An unidentified woman had phoned Turner much earlier that day and informed him that a tall, dark-skinned, young, black male went by the name "Smokey," lived in the area of 59th and Morgan, and had committed a killing in that area. (Tr. S.R.I A59-60, 71-72). When Turner related this information, Halloran responded that a person called "Smokey" was

there assisting police with another investigation. (Tr. S.R.I A60-61).

      10.     Turner then talked with Plummer alone for about ten minutes, first reading him

the FOP *Miranda* warnings. (Tr. S.R.I A61-63). Plummer told Turner that he lived around the

59th Street area and that he went by the name Smokey. (Tr. S.R.I A65-66). Turner told Plummer

that he fit an eyewitness description of the Engram shooter. (Tr. S.R.I A68). Turner never again

spoke with Plummer. (Tr. S.R.I A69).

      11.     Turner talked with Detective Devon Anderson, his partner and other detectives

concerning his investigation in the Engram matter. (Tr. S.R.I A68, 94, 96). He told them that a

person named Smokey may have been responsible for the Engram killing and that a person

named Smokey was in the station assisting in another homicide investigation. (Tr. S.R.I A96).

      12.     Anderson contacted Reiko Dyson, an eyewitness to the Engram shooting. (Tr.

S.R.I A68, 97). Other detectives began to interview Plummer about the Phillips killing, but were

informed that Plummer was to participate in a lineup relating to the instant Engram case. (Tr. R.I

A63). Plummer was given food around 7:00 p.m. (Tr. R.I A62). The police placed Plummer in

a lineup at approximately 8:30 p.m. that evening, and Dyson identified him as the Engram

shooter. (Tr. R.I A63-64, 97-98). The police then arrested Plummer. (Tr. R.I A64).

      13.     Around fifteen minutes later, Anderson testified, he spoke with Plummer alone in

an interrogation room at the station, first giving him the *Miranda* warnings. (Tr. S.R.I A99).

Plummer was not handcuffed. (Tr. S.R. I A103). Plummer stated that his name was Smokey and

told Anderson where he lived. (Tr. S.R.I A99). Anderson also gave Plummer "juvenile

warnings," or advice that he could be charged as an adult. (Tr. S.R.I A100, 102). He told

Plummer that an eyewitness to the Engram shooting had identified him in the lineup. (Tr. S.R.I

A102). The two talked for 15-20 minutes and Anderson left the room. (Tr. S.R.I A103). He

contacted Youth Officer Frank McCall and felony review. (Tr. S.R.I A9-10, 103).

14.     When Youth Officer McCall arrived at the station on the 19th, he testified, he saw

Plummer sitting in an interview room; Plummer was not handcuffed. (Tr. S.R.I A12). McCall

knew that the person giving the statement was a minor. (Tr. S.R.I A24). His job as a youth

officer was to protect the rights of youth. (Tr. S.R.I A30). He testified that a youth's rights are

limited to the *Miranda* rights and advice that he can be tried as an adult. (Tr. S.R.I A30-31). As

a youth officer, McCall stated, he was present only to see that Plummer's rights were "given to

him." (Tr. S.R.I A32).

15.     McCall did not ascertain how long Plummer had been at the station or how long

his prior conversations with police lasted. (Tr. S.R.I A24-30). He did not ask Plummer whether

he wanted to contact a family member. (Tr. S.R.I A33). He made no attempt to contact

Plummer's mother. (Tr. S.R.I A34). McCall explained that he did not attempt to contact

Plummer's family because Detective Anderson told him they had already been contacted:

> Q.     Did you make any effort after you spoke to John to
> initiate any contact with anyone in his family?
>
> A.     I was already aware that the Detectives had made
> contact with members of his family. . .
>
> A.     I recall being told that the mother was notified that he
> was in custody.

(Tr. S.R.I A32-34).

16.     Although McCall testified that Anderson told him he notified Plummer's mother

that Plummer was in custody, Anderson himself said that he never spoke with Plummer's

mother:

> Q.    [Defense Counsel] Did you ever go back and ask him [Plummer] if he wanted to contact his family?
>
> A.    [Anderson] Yes.
>
> Q.    You did ask him that?
>
> A.    Yes, after he was identified in the line-up.
>
> Q.    You asked him if he wanted to call his Mom?
>
> A.    Yes.
>
> Q.    And he did, didn't he?
>
> A.    I made attempts to contact his mother.
>
> Q.    Did you reach her?
>
> A.    No.

(Tr. S.R.I A125-26).

17.    At approximately 11:15 or 11:30 that night of August 19th, Anderson and McCall testified, Assistant State's Attorney Marback spoke with Plummer in an office at the station; Anderson and McCall were present. (Tr. S.R.I A12-16, 104-05). Marback informed Plummer that he was a lawyer for the State, not his lawyer, gave Plummer the *Miranda* warnings, and advised Plummer that he could be charged as an adult. (Tr. S.R.I A13, 104-05). Anderson testified that Marback talked to Plummer for 15 to 20 minutes. (Tr. S.R.I A105). McCall testified that Marback talked to Plummer for 30 to 40 minutes. (Tr. S.R.I A14).

18.    Anderson and McCall testified that Marback asked Plummer to reduce his statement to writing and Plummer gave a handwritten statement around 12:35 am. on August 20,

1991. (Tr. S.R.I A15, 107). Anderson, Youth Officer McCall, and ASA Marback were present. Marback handwrote the statement as Plummer related what happened. (Tr. S.R.I A16-17, 107). They went over the statement. (Tr. S.R.I A16-17, 107).

19.     Plummer gave a different account of his day at the station. He presented the following evidence at the suppression hearing.

20.     Between 9:00 and 10:00 a.m. on August 18, 1991, Plummer was with two other boys in the area of 59th and Union. (Tr. R.I B8-9). Two detectives drove by, took the three boys into custody, and drove them to the Area Three police station. (Tr. R.I B8-9, 12-14). He stayed at the station for five or six hours in a small, closed room with no table or chair. (Tr. R.I B14). There was a ring on the wall and Plummer was handcuffed. (Tr. R.I B14). Neither Plummer's mother nor any other family member was at the station and Plummer had not talked with his mother before going to the station. (Tr. R.I B14). At some point, Kill and his partner took Plummer to the scene of the Phillips shooting. (Tr. R.I B15-16). Kill and his partner took Plummer back to the station around 8:00 or 9:00 that evening and put him back into a room. (Tr. R.I B10-11, 16). At the detectives' request, Plummer told them what he had seen regarding the Phillips shooting. (Tr. R.I B17).

21.     Plummer asked Kill if he could go home and Kill laughed. (Tr. R.I B17). Later, Plummer told Kill three or four times that he wanted a lawyer, that he wanted to speak with his mother, and that Kill should tell Plummer's mother to come get him. (Tr. R.I B23). Kill smiled, laughed, and left the room. (Tr. R.I B23-24). Plummer remained at the station from that Sunday, August 18, 1991 until approximately Tuesday or Wednesday, when he was sent to a juvenile facility. (Tr. R.I B17, 19).

22.     Plummer was moved from room to room, changing rooms every two to three hours and, ultimately, was placed in approximately four or five different rooms. (Tr. R.I B18, 24). Many different detectives came in and out of the rooms and questioned him. (Tr. R.I B18, 20). Plummer specifically recalled seeing Detectives Turner and Anderson and Officer McCall; he could not recall the names of other detectives. (Tr. R.I B18, 20). Plummer was handcuffed to a pole when talking with Kill. (Tr. R.I B22). In another room, Plummer was handcuffed to a radiator. (Tr. R.I B24).

23.     Kill struck Plummer. (Tr. R.I B24, 27). At one point, Plummer was sitting with his left arm handcuffed to the wall. (Tr. R.I B25). Kill struck him with a flashlight on his mid-right side and on his face, hitting him two or three times. (Tr. R.I B25-26, 30). Kill and his partner pulled Plummer's hair and Kill walked out. (Tr. R.I B26, 30). This incident lasted two or three minutes; there were other people in the room at that time. (Tr. R.I B26).

24.     Kill's partner told Plummer that he would get 40 years in the Engram case. (Tr. R.I B31). He also told Plummer that he would get "fucked" or raped in the penitentiary. (Tr. R.I B31). Another detective, whom Plummer knew only as "Nick," took Plummer's shoes and said they matched the "prints." (Tr. R.I B28).

25.     From the time fifteen-year-old Plummer went to the station, he believed he was in custody and was not free to leave. (Tr. R.I B32, 34). He admitted to signing a written statement in the instant case. (Tr. R.I B21, 33). He signed the statement because he wanted to get away. When he gave the statements, Plummer felt tired, very uncomfortable, and scared. (Tr. R.I B34). He described the atmosphere in the station as "very odd." (Tr. R.I B34).

26.     All the police officers who testified for the State, Kill, Halloran, Turner,

Anderson, and McCall, stated that neither they nor anyone in their presence ever pulled

Plummer's hair, struck or physically abused him, lied to him, exerted psychological coercion

upon him, or mistreated him in any way. Further, they testified, Plummer never complained to

them of mistreatment. (Tr. R.I A13-14, 20-21, 37-38, 65-66, 68, 82; Tr. S.R.I A69, 84-86, 92,

111-12, 126). Kill testified that he did not tell Plummer he would get 40 years and get "fucked-

up" in prison. (Tr. R.I A14). Turner and Anderson testified that neither they nor anyone in their

presence took Plummer's shoes or said they matched the "prints." (Tr. S.R.I A92, A112).

Halloran, Kill, and McCall denied that Plummer ever asked to speak with a lawyer or his mother.

(Tr. R.I A13, A65; Tr. S.R.I A52). Kill testified that he never laughed at or mocked Plummer for

making such a request. (Tr. R.IA13). According to McCall, Plummer never expressed a desire

to remain silent. (Tr. S.R.I A52).

27.     Plummer's mother testified that she visited him on August 21, 1991, the day after

his police statement. (Tr. R.II C67). She noticed that his face was swollen on both sides. (Tr.

R.II C70). His back was also swollen and he had a dark mark in his upper chest area. (Tr. R.II

C70-71). She asked Plummer what happened and he told her the police beat him up. (Tr. R.II

C71).

28.     Plummer's mother did not see him on August 18 or 19, 1991. (Tr. R.II C67). At

that time, Plummer was living with his aunt. (Tr. R.II C72-74). Neither Plummer nor any police

officers went to the home of Plummer's mother during that period. (Tr. R.II C67). A police

officer called her Tuesday night, August 19th and told her that Plummer was being charged with

murder. (Tr. R.II C68). The officer told her there was no reason to come to the station and

allowed her to speak with Plummer. (Tr. R.II C68-70). Before that Tuesday night, no police

officer ever called Plummer's mother, came to her house, or asked her whether she wanted to see her son. (Tr. R.II C68).

29.    A little over a year or so before this incident, Plummer had been hospitalized for an attempted suicide. (Tr. R.II C75-76). When he was released from the hospital, his doctor recommended that he live away from his mother because of family problems. (Tr. R.II C74-75).

30.    Dr. Lawrence Heinrich testified at the suppression hearing that he had evaluated Plummer's mental health while Plummer was awaiting trial. Heinrich met with Plummer in person four times and reviewed Plummer's psychiatric history and records. (Tr. R.II C34-6, 42). He noted that Plummer had an extensive history of mental illness and depression and had been hospitalized and treated as an outpatient on multiple occasions between 1984 and 1989. (Tr. R.II C4-6). Heinrich pointed out that a juvenile detention psychiatrist had diagnosed Plummer as acutely psychotic and recommended hospitalization and medication after Plummer reported visual and auditory hallucinations of his mother coming to him naked in the detention facility and of a little boy named "Billy" who was his protector. (Tr. R.II C4; Tr. C. 41).

31.    Heinrich himself diagnosed Plummer with an ongoing and deteriorating schizo-affective disorder, a disorder which involves multiple symptoms, including problems with paranoia, suspicion, affective disturbance, mood disorder, and thought disturbance. (Tr. R.II C6-7, 27, 60). Heinrich testified that, historically, Plummer had reported hallucinations. (Tr. R.II C8). Plummer had trouble grasping reality and his mental processes sometimes interfered with his ability to communicate. (Tr. R.II C9). Plummer experienced feelings of distrust and isolation. (Tr. R.II C9).

32.    Heinrich opined that Plummer's will would have been overborne by the stress of

prolonged interrogation. (Tr. R.II C10). Plummer cannot handle stress, and would do anything to get out of a stressful situation. (Tr. R.II C8). He would not, however, necessarily understand what he was doing. (Tr. R.II C10). Physical abuse would place Plummer under even more stress. (Tr. R.II C56-57). Plummer could not spontaneously make a detailed statement such as the one he gave in the Engram case. (Tr. R.II C11). Police would have to give Plummer the information and he would sign off on it. (Tr. R.II C45-46).

33.     Heinrich denied that Plummer was malingering, rejecting the diagnosis of the State's psychiatrist, Dr. Albert Stipes. (Tr. R.II C40-42). Heinrich rejected the malingering diagnosis because he felt Plummer had underlying pathology and disorder. (Tr. R.II C63). Heinrich suggested that he obtained a clearer picture of Plummer's mental health because he spent more time with him than did Stipes, thereby gaining Plummer's trust and cooperation. (Tr. R.II C42, 59-63).

34.     The State's rebuttal psychiatrist, Dr. Albert Stipes, diagnosed Plummer as a malingerer. (Tr. S.R.I B3). This meant, Stipes explained, that he believed Plummer to be faking or exaggerating any mental illness or symptoms. (Tr. S.R.I B3). Stipes testified that an IQ test administered to Plummer assessed Plummer with a verbal IQ of 75, a performance IQ of 65, and a full scale IQ of 68. (Tr. S.R.I B7). Stipes felt the IQ test underestimated Plummer's intellectual ability, because Plummer was malingering and uncooperative. (Tr. S.R.I B7). Stipes was aware of Plummer's hallucinations reported to a juvenile detention psychiatrist and of that doctor's opinion that Plummer was blatantly psychotic. (Tr. S.R.I B12-14). Stipes was also aware of Heinrich's diagnosis that Plummer has a schizo-affective disorder. (Tr. S.R.I B23). Stipes opined that one depressive episode does not indicate the presence of a schizo-affective

disorder and reiterated his opinion that Plummer was malingering when he examined him. (Tr. S.R.I B25, 27).

36. After hearing all the testimony, the circuit court found that the police exerted no physical, psychological, or emotional coercion on Plummer. (Tr. S.R.I B42). The court denied Plummer's motion to suppress on October 31, 1994. (Tr. S.R.I B42).

**Trial**

36. Plummer waived his right to a jury trial, electing a bench trial before the Honorable Vincent Gaughan. (Tr. S.R.II C3-4; Tr. C. 61). At trial, the State presented the following evidence.

37. Shortly before 1:00 p.m. on August 11, 1991, Roger Taylor was riding his bike on Morgan Street, going toward 60th Street. (Tr. S.R.II C17). He testified that he saw Plummer running up 60th Street with a gun in his hand. (Tr. S.R.II C19, 25). He had seen Plummer around before and knew him by the nickname Smokey. (Tr. S.R.II C18-19, 40). Plummer went down into a basement candy store, and Taylor heard three or four gunshots. (Tr. S.R.II C19). Taylor was approximately 12 feet away.

38. Reiko Dyson was in that basement candy store with Michael Engram, her three-year old son, D'Andre, and the store owner at the time of the shooting. (Tr. S.R.II C46-49). As Engram, Dyson, and her son looked around the store, Dyson testified, Plummer walked in. (Tr. S.R.II C50). Dyson noticed that he had a gun. (Tr. S.R.II C51). Engram turned toward Plummer. (Tr. S.R.II C52, 72, 88). Almost immediately, Plummer fired eight or nine shots, shooting Engram. (Tr. S.R.II C51-52, 88). Neither Engram nor Plummer spoke before or after Plummer fired. (Tr. S.R.II C53, 87). Engram did not have anything in his hands. (Tr. S.R.II

C52, 84). After eight or nine shots, Engram fell to the floor. (Tr. S.R.II C53). Plummer then ran from the store. (Tr. S.R.II C20, 53).

39. Plummer, Taylor testified, ran toward 61st Street, putting on a white t-shirt as he ran. (Tr. S.R.II C20). Taylor looked into the basement and lost sight of Plummer. (Tr. S.R.II C20-21).

40. Engram had been shot in the head and chest. (Tr. S.R.II C54). He died that night of internal injuries caused by multiple gunshot wounds. (Tr. S.R.II C119-22). D'Andre's right pinky finger was also injured. (Tr. S.R.II C56). He was hospitalized overnight. (Tr. S.R.II C56).

41. Assistant State's Attorney William Marback testified that he was working felony review on August 19, 1991, eight days after the Engram shooting. After nine o'clock that evening he was called to the Area Three police station and spoke with detectives concerning the Engram case. (Tr. S.R.II C126).

42. At approximately 11:30 that same night, Marback testified, he talked with Plummer in the presence of Detective Anderson and Youth Officer McCall. (Tr. S.R.II C127). Before speaking with Plummer, Marback advised Plummer of his *Miranda* rights, told Plummer that he was a lawyer working with the police and was not his lawyer, and advised Plummer that he could be tried and sentenced for murder as an adult. (Tr. S.R.II C128-29). Plummer indicated that he understood that and talked with Marback for half an hour concerning the Engram case. (Tr. S.R.II C129). Plummer gave a mostly narrative account of the occurrence, although Marback sometimes interrupted with questions which Plummer answered. (Tr. S.R.II C130).

43. Marback testified that Plummer then agreed to give a handwritten statement. (Tr. S.R.II C130). The officers left the room momentarily and Marback asked Plummer how they had

treated him. (Tr. S.R.II C131). Plummer indicated that the police treated him fine. (Tr. S.R.II C131). They had given him a cigarette and soda and allowed him to use the bathroom. (Tr. S.R.II C131). Marback took Plummer's handwritten statement, writing it out as Plummer sat next to him relating the story. (Tr. S.R.II C131). Marback went over the statement with Plummer, with Plummer reading aloud the *Miranda* portion of the statement and a line or two of the handwritten statement. (Tr. S.R.II C131-32). Marback then read the remainder of the statement line by line, making corrections and additions at Plummer's request. (Tr. S.R.II C132). After signing the statement, Plummer requested an amendment, which was made. (Tr. S.R.II C137).

44.     The handwritten statement was read into evidence. (Tr. S.R.II C139-45). The statement inculpated Plummer in the Engram killing. (Tr. S.R.II C139-45). In summary, the statement indicates that Plummer and Engram had some confrontations in which Engram threatened or intimidated Plummer. (Tr. S.R.II C141). Plummer was afraid of Engram. (Tr. S.R.II C141). Plummer went to the candy store to buy some candy. (Tr. S.R.II C143). When he arrived, Engram walked toward him and threatened to beat him. (Tr. S.R.II C143). Plummer pulled a gun from his waistband and shot Engram. (Tr. S.R.II C144).

45.     The defense proceeded by way of stipulation. (Tr. R.II E5-7). The parties stipulated that Plummer told various detectives who questioned him at Area Three that he told Engram he did not want any trouble. (Tr. R.II E5). It was further stipulated that Roger Taylor never told any police officer or personnel that Plummer had a gun in his hand as he ran down the street. (Tr. R.II E6). Finally, Dr. Lawrence Heinrich's testimony from the hearing on Plummer's motion to suppress was admitted by stipulation. (Tr. R.II E6).

46.     In rebuttal, the State presented, by stipulation, Dr. Albert Stipes' testimony from the hearing on Plummer's motion to suppress. (Tr. R.II E7-8). The parties gave closing argument.

47.     The court found Plummer guilty of first degree murder, attempt murder, and aggravated battery with a firearm. (Tr. R.II E21, F25; Tr. C. 64). The court sentenced Plummer to 50 years in prison for the first degree murder conviction and to 25 years in prison for each of the other convictions; all sentences were ordered to run concurrently. (Tr. R.II E21, F25; Tr. C. 64).

### Direct Appeal

48.     The Appellate Court of Illinois affirmed Plummer's convictions on direct appeal in *People v. Plummer*, 306 Ill.App.3d 574, 714 N.E.2d 63 (1st Dist. 1999) (attached as Exhibit 1). The Supreme Court of Illinois denied leave to appeal. *People v. Plummer*, 185 Ill.2d 655, 720 N.E.2d 1102 (1999) (Table).

### State Post-Conviction Proceedings & Appeals

49.     While his direct appeal was pending, Plummer filed a *pro se* petition for post-conviction relief, and he filed several *pro se* supplements to the petition. (P.C. C 20-32, 35-46, 52-53, 54-56, 85-96). In his *pro se* petition, Plummer alleged, among other things, that police physically and psychologically abused him to extract his statements. (P.C. C. 23-24, 27, 56). The circuit court appointed counsel. Counsel filed a very brief supplemental petition alleging one claim. (P.C. C. 73-74). Counsel otherwise stood on the *pro se* pleadings and declined to give an oral argument at the hearing on the State's motion to dismiss. (P.C. R. 9). The circuit court dismissed the petition in its entirety. (P.C. C. 398, R. 10).

50.     The Appellate Court of Illinois reversed that dismissal and remanded for further post-conviction proceedings, holding that Plummer's post-conviction counsel failed to provide adequate assistance as required under the state statute and court rules governing the assistance of counsel on post-conviction review. *People v. Johnnie Plummer*, Appeal No. 1-01-0130 (1st Dist. 2003) (unpublished order pursuant to Supreme Court of Illinois Rule 23) (attached as Exhibit 2). Specifically, the court held that the record affirmatively showed that post-conviction counsel failed to file an amended petition (1) presenting several of Plummer's claims in their proper legal context and (2) responding to the State's assertions that Plummer's claims were either forfeited or barred by the doctrine of *res judicata*. *Id.* at pp. 11-13.

51.     On remand, Plummer filed six *pro se* supplements to his original petition, alleging that police reports showed that Detectives Kill and Halloran had committed perjury at the suppression hearing, and arguing that his appellate counsel was ineffective for failing to raise trial counsel's ineffectiveness. (Rem. C. 77-91, 108-115, 184-89; Rem. Supp. I 2-14). On remand, post-conviction counsel filed a 2 1/2 page supplemental petition, containing bare allegations that Plummer's trial counsel had been ineffective at various points throughout the trial proceedings. (Rem. S.R.I 2-4). On the State's motion, the circuit court again dismissed Plummer's post-conviction petition. (Rem. R. X-20-21).

52.     Plummer again appealed the dismissal of his post-conviction petition, arguing, among other things, that his counsel failed to fulfill her duties as post-conviction counsel under state law. This time, the Appellate Court of Illinois affirmed the dismissal of Plummer's post-conviction petition. *People v. Johnnie Plummer*, Appeal No. 1-06-1552 (1st Dist. 2009) (unpublished order pursuant to Supreme Court of Illinois Rule 23)

## Ground For Relief

**In light of Johnnie Plummer's youth, his severe psychological disorders, the absence of a meaningful opportunity to confer with a concerned adult, the duration of time he spent at the police station prior to making a statement, and physical coercion by police, Johnnie Plummer's statements to police were involuntary. Thus, their admission at trial violated Plummer's Fifth & Fourteenth Amendment rights against self-incrimination and to due process.**

## Constitutional Basis for the Claim

53.  ˙ The admission of a confession which has been involuntarily obtained through physical and psychological coercion violates due process and the privilege against self-incrimination. U.S. Const. Amends V & XIV; *Miranda v. Arizona*, 384 U.S. 436 (1966); *Gallegos v. Colorado*, 370 U.S. 49 (1962); *Haley v. Ohio*, 332 U.S. 596 (1948). Whether a confession has been involuntarily obtained is determined by the totality of the circumstances surrounding the confession. *Gallegos*, 370 U.S. at 55. Where, as here, the person subject to police interrogation is a minor child, the confession is more carefully scrutinized, as a child who is cut off from the support and advice of his parents can easily have his will overborne by law enforcement personnel. *See id*. at 53. *See also Haley*, 598-601.

## Factual Allegations

54.     At the time of his statements, fifteen-year-old Plummer suffered severe psychiatric disorders which made him particularly vulnerable to the pressures of police interrogation. Further, although his youth necessitated the opportunity to confer with an adult interested in his welfare, the police deprived Plummer of any such meaningful opportunity for consultation. This was true despite the presence of a youth officer at the time Plummer made his

statements, because the youth officer did nothing to protect Plummer's welfare. Furthermore,

police subjected Plummer to lengthy and repeated police questioning in this and another case and

kept him at the station for at least 19 hours, from approximately 4:00 in the morning on August

19, 1991 until approximately 11:00 that night, before he made any incriminating statements to

the police. Finally, police officers exerted physical and psychological coercion to obtain

Plummer's confession, striking him with their hands and with a flashlight, handcuffing him to a

ring on the wall and other objects in the interrogation room, pulling his hair, and telling him he

would get "fucked" or raped in prison. (Tr. R.I B18-28).

### Plummer's Serious Mental Disturbance Influenced His Police Statements

55.     Plummer had an extensive history of psychiatric disturbance. This history

included a suicide attempt, multiple psychiatric hospitalizations, and outpatient treatment for

ongoing psychiatric disorders between 1984 and 1989. (Tr. R.II C4-6, 74-76).

56.     Further, Plummer experienced visual and auditory hallucinations. (Tr. RII C4, 8;

Tr. C. 41). He was diagnosed as acutely psychotic and was recommended for hospitalization and

psychotropic drug treatment. (Tr. RII C4, 8; Tr. C. 41). In addition, Dr. Lawrence Heinrich

diagnosed Plummer with schizo-affective disorder, which he described as a disorder involving

multiple psychiatric maladies, including paranoia, suspicion, affective disturbance, mood

disorder, and thought disturbance. (Tr. R.II C6-7, 27, 60). Heinrich characterized Plummer's

disorder as ongoing and deteriorating. (Tr. R.II C6-7, 27). He stated that Plummer had difficulty

grasping reality and, when under stress, would take drastic action to escape the stress without

understanding the consequences of his actions. (Tr. R.II C8-10).

57.     Heinrich opined that Plummer's will would have been overborne by the stress of

prolonged interrogation. (Tr. R.II C9-10). He further opined that Plummer could not

spontaneously make a statement such as that given in the instant case. (Tr. RII C11). For

Plummer to make such a statement, Heinrich opined, the police would have to give Plummer the

information, and he would merely sign off on it. (Tr. R.II C45-46).

### Denial of an Opportunity to Confer with an Adult Interested in Plummer's Welfare

58.     Police initially took Plummer to the station as a witness in an unrelated case. He

became, and the police confronted him as, a suspect in the instant case at approximately 4:00

p.m. on Monday, August 19, 1991. At that time, police learned that he used the same nickname

as a person implicated in the Engram shooting. (Tr. S.R.I A59-60, 68).

59.     Once Plummer became a suspect, police failed to take any steps to ensure that

Plummer could confer with a parent. Police never attempted to contact Plummer's mother until

after they had placed Plummer in a lineup at 8:30 that evening, four and one-half hours after

police informed Plummer that he "fit the description" of the Engram shooter and shortly after

detectives told Plummer that an eyewitness had identified him as the Engram shooter. (Tr. S.R.II

A34, 86, 125-26; Tr. R.I A68; Tr. S.R.I A68, 102). It was, in part, this lineup that prompted

Plummer to give a statement that night. (Tr. S.R.II C127, 138; Tr. S.R.I A12, 15; 104-5, 107).

60.     Police also failed to talk with Plummer's mother or guardian prior to extracting

his statements. (Tr. S.R.I A34, 86, 125-26; Tr. R.I A68; Tr. R.II C67-68). (Although one

detective claimed to have unsuccessfully attempted to reach her, this same detective falsely told

the youth officer that he had contacted Plummer's mother and notified her that Plummer was in

custody. (Tr. S.R.I A32-34, 125-26).) Plummer's mother received no notice that he was in

police custody as a suspect until the Tuesday night following his statements. (Tr. R.II C68).

61.     Nor did detectives contact a youth officer until 10:45 that night, just 30 to 45 minutes before extracting Plummer's confession, although police had known for hours prior to that that Plummer was a suspect. (Tr. S.R.I A9-10, 12, 104).

62.     Further, no youth officer was contacted until after officers told Plummer he was a murder suspect, placed him in the lineup, and informed him that an eyewitness identified him in the lineup. (Tr. S.R.I A9-10, 12, 104).

63.     Further, even when present, Youth Officer McCall failed to carry out his affirmative duty to protect Plummer's interest before or during police and prosecutorial interrogation of Plummer. He took no action to protect Plummer's interests. McCall made no effort to contact Plummer's parent or family. (Tr. S.R.I A33-34). McCall said Anderson told him he had already notified Plummer's mother that Plummer was in custody. (Tr. S.R.I A32-34). However, Anderson himself testified that he never spoke with Plummer's mother. (Tr. S.R.I A125-26). Other than introducing himself, Youth Officer McCall never conferred with Plummer in any way. (Tr. S.R.I A44). He never told Plummer he was there to protect Plummer's interests. (Tr. S.R.I A44). He never advised Plummer of any rights, never asked Plummer whether he understood his rights, and never explained the meaning of any particular rights or terms to Plummer. (Tr. S.R.I A37-42, 45-46).

64.     Moreover, McCall believed that a youth's rights were limited to the *Miranda* rights and advice that he can be tried as an adult. (Tr. S.R.I A30-31). As a youth officer, McCall stated, he was present only to see that Plummer's rights were "given to him." (Tr. S.R.I A32). The only action McCall took was to witness Plummer's interrogation, without comment or consultation. (Tr. S.R.I A9-57). Thus, McCall failed to fulfill his function as a concerned adult

who was present to protect Plummer's interests.

**Physical and Mental Coercion by Police Officers**

65.     While in the station, Plummer was moved from interrogation room to interrogation room. He was handcuffed, alternately, to a ring on the wall, to pole, and to a radiator. (Tr. R.I B18-24). Detective Kill struck Plummer with a flashlight on his mid-right side and on his face, hitting him two or three times. (Tr. R.I B24-30). Detectives pulled Plummer's hair. (Tr. R.I B26, 30). One detective told Plummer that Plummer would get 40 years in prison and would get "fucked" or raped in the penitentiary. (Tr. R.I B31). Another detective, whom Plummer knew only as "Nick," took Plummer's shoes and falsely said they matched the "prints." (Tr. R.I B28).

66.     Plummer's description of physical abuse at the hands of Detective Kill is not unique. There is a great deal of evidence about the abusive practices of the police under the command of Jon Burge at Areas 2 and 3.[2] Specifically, there is evidence of a pattern of brutality against African-American youth by Detectives Kill and Boudreau, or in their presence, from 1988 to 1991, during Sergeant Jon Burge's tenure at Area 3. See Exhibit 4, Documented Allegations of Kill Misconduct at Area 3 (listing public and disciplinary records involving alleged victims of Kill); Burge repeatedly takes 5th; Former police commander stays mum on torture questions, Hal Dardick, Chi. Trib., September 2, 2004 (Burge "rose through the ranks" at Area 2 before becoming commander at Area 3).

---

[2] Burge worked at Area 2 before being promoted to Commander at Area 3. *See, e.g., Cannon v. Burge* amended complaint, at 2 ¶ 4, available at http://www.law.northwestern.edu/macarthur/documents/police/CannonComplaint.pdf (last viewed September 27, 2010).

67.     Numerous published decisions by Illinois courts have documented similar claims of police abuse and coercion, usually of young African-Americans, at the hands of Detective Kill. *See, e.g., People v. Kitchen*, 159 Ill.2d 1, 30, 636 N.E.2d 433 (1994) (defendant alleged he was hit and kicked in the head, chest and groin by Kill and Burge on August 25, 1988); *People v. Lash*, 252 Ill.App.3d 239, 243-45, 624 N.E.2d 1129 (1st Dist. 1993) (noting that 16-year-old defendant testified that Kill abused him during attempt murder interrogation at Area 3 on September 14, 1989); *People v. Robinson*, 238 Ill.App.3d 48, 50-51, 606 N.E.2d 122 (1st Dist. 1992) (noting that defendant testified that he agreed to give statement after Kill abused him during murder investigation in 1988).

68.     Investigation into police torture, including the OPS reports written in 1990 about the systematic abuse under Jon Burge. See, e.g., Probers Believe Brutality Claims, Steve Mills, Chi. Trib., May 21, 2003 (quoting special prosecutor Egan as saying that "[y]ou'd have to be a chump not to" believe allegations of police torture); Chicago Police Department Office of Professional Standards, Goldston and Sanders Reports (1990) (cited in *Patterson*). Many cases and publications that have emerged in recent years acknowledging police abuse in Areas 2 and 3 under Jon Burge's command, as well as Governor Ryan's commutations due to police torture. *See, e.g., Patterson*, 192 Ill.2d at 144-45 (reversing dismissal of post-conviction petition based on evidence of pattern and practice of police torture at Area 2 by Burge and detectives and remanding for evidentiary hearing); *King*, 192 Ill.2d at 198-99 (same); *People v. Cannon*, 293 Ill.App.3d 634, 642, 688 N.E.2d 693 (1st Dist. 1997) (remanding for new hearing on voluntariness of defendant's confession based on new evidence of police torture at Area 2); *Maxwell v. Gilmore*, 37 F. Supp. 2d 1078, 1094 (N.D. Ill. 1999) (stating that it is "now common

knowledge that in the early to mid-1980s Chicago Police Commander Jon Burge and many officers working under him regularly engaged in the physical abuse and torture of prisoners to extract confessions," and noting that the number of "police accounts and numerous lawsuits and appeals brought by defendants alleging such abuse substantiate that those beatings and other means of torture occurred as an established practice, not just on an isolated basis"); Ryan to Pardon 4 on Death Row, Steve Mills and Maurice Possley, Chi. Trib., Jan. 10, 2003 (reporting then-Governor Ryan's intent to pardon four men whose confessions were extracted via torture by Chicago police).

69.     There is other evidence of the history of brutality by Detective Kill at Area 3, including numerous OPS complaints. See Exhibit 4, Documented Allegations of Kill Misconduct at Area 3. In 1993, Marcus Wiggins filed a federal civil rights lawsuit against Jon Burge and other Area 3 detectives, including Detectives Michael Kill and Kenneth Boudreau, for police brutality in obtaining a confession. See Suit Alleges Cop Torture of Youth, Colin McMahon & Christine Hawes, Chi. Trib., Jan. 14, 1993. The *Wiggins* case is particularly probative because he alleged torture at an Area 3 interrogation that took place only one month after Plummer's interrogation. *Id.* That lawsuit alleged that during Wiggins's interrogation, he was handcuffed to the wall and punched in the chest. *Id.*

**Other Circumstances Demonstrating that Plummer Was Coerced into Confessing**

70.     The police kept Plummer at the station for a long period of time, approximately 19 hours, before he made his statements. They took him to Area Three at approximately 4:00 a.m. on August 19th and extracted his statements at approximately 11:00 or 11:30 p.m. that night. (Tr. R.I A9; Tr. S.R.II C127, 138; Tr. S.R.I A12, 15; 104-5, 107). During this lengthy period,

police confined Plummer almost exclusively to an interrogation room and subjected him to extensive police interrogation.

71.     While at the station, Plummer was confined to an interrogation room in which there was no bed and, thus, no opportunity for restful sleep. (Tr. R.I B58). Given that police took Plummer to the station in the middle of the night and given the length of time they kept him there, Plummer was undoubtedly sleep deprived at the time of his confession.

### Presentation of the Federal Claim

72.     Plummer raised his claim that his confession was involuntarily given on direct appeal. *People v. Plummer*, 306 Ill.App.3d 574, 714 N.E.2d 63 (1st Dist. 1999). The intermediate appellate court rejected his claim, and Plummer sought leave to appeal to the Supreme Court of Illinois, also alleging that his confession was involuntarily given. The Supreme Court of Illinois denied leave to appeal. *People v. Plummer*, 185 Ill.2d 655, 720 N.E.2d 1102 (1999) (Table).

### Relief Requested

73.     Plummer asks this court to issue a conditional writ of habeas corpus ordering the Illinois court to either release him or afford him a new trial within a specified period of time.

**PART III, PETITIONER'S CLAIMS** (continued)

2.      Have all grounds raised in this petition been presented to the highest court having jurisdiction?

     YES (**X**)    NO ( )

3.      If you answered **"NO"** to question (2) state <u>briefly</u> what grounds were not so presented and why not:

**Does not apply.**

## PART IV - REPRESENTATION

Give the name and address, if known, or each attorney who represented you in the following stages of the judgment attacked herein:

      (A)    At preliminary hearing

**Does not apply. As Plummer was charged by indictment, no preliminary hearing was held.**

      (B)    At arraignment and plea:

**Cook County Public Defender**
**2650 S. California Ave.**
**Chicago, IL 60608**

      (C)    At trial:

**Anthony Eben, Former Assistant Public Defender**
**Cook County Public Defender**
**2650 S. California Ave.**
**Chicago, IL 60608**

      (D)    At sentencing:

**Anthony Eben, Former Assistant Public Defender**
**Cook County Public Defender**
**2650 S. California Ave.**
**Chicago, IL 60608**

      (E)    On appeal

**Kim L. Sorrells & Donald Honchnell, Assistant Public Defenders**
**Cook County Public Defender**
**69 W. Washington, 15th Floor**
**Chicago, IL 60602**

      (F)    In any Post-Conviction proceeding

**Gwendolette Brown, Assistant Public Defender**
**Cook County Public Defender**
**69 W. Washington, 15th Floor**
**Chicago, IL 60602**

      (G)    Other (state):

**Geneva L. Penson, Staff Attorney**
**Office of the State Appellate Defender**
**Capital Post-Conviction Unit**
**20 N. Clark St., 28th Floor**
**Chicago, IL 60602**

**(Counsel for Petitioner in his first post-conviction appeal)**

**Aliza Kaliski, Former Assistant Appellate Defender**
**Office of the State Appellate Defender**
**First District Office**
**203 N. LaSalle Street, 24th Floor**
**Chicago, IL 60601**

**(Counsel for Petitioner in his second post-conviction appeal)**

## PART V - FUTURE SENTENCE

Do you have any future sentence to serve following the sentence imposed by this conviction?

YES (**X**)    NO ( )

Name and location of the court which imposed the sentence:

**Circuit Court of Cook County, Illinois**

Date and length of sentence to be served in the future:

**Plummer is currently serving a natural life sentence imposed for a separate murder**
**conviction. The sentence of natural life in that separate case was mandatory due to**
**Plummer's prior murder conviction in this case.**

WHEREFORE, petitioner prays that the court grant petitioner all relief to which he may be entitled in this proceeding.

Signed on:     **September 29, 2010**

_____
Geneva L. Penson
Staff Attorney
Office of the State Appellate Defender
Capital Post-Conviction Unit
20 N. Clark St., 28th Floor
Chicago, Illinois 60602

I declare under penalty of perjury that the foregoing is true and correct.

_Johnnie Plummer_

_____

Johnnie Plummer                                    (Signature of petitioner)
Register No. K-65650                               (I.D. Number)
Menard Correctional Center                         (Address)
PO Box 711
Menard, Illinois  62259