**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

JOHNNIE PLUMMER,

                        **Plaintiff,**

        **v.**

DAVE REDNOUR, Warden, Menard
Correctional Center,

                        **Defendant.**

Case NO. 10 C 6225

Hon. Harry D. Leinenweber

## MEMORANDUM OPINION AND ORDER

Before the Court is Petitioner Johnnie Plummer's ("Plummer") Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254. For the reasons stated herein, the petition is denied.

## I. BACKGROUND

Johnnie Plummer, then a juvenile, was tried as an adult in Cook County Circuit Court and convicted of the first-degree murder, attempted first-degree murder, and aggravated battery with a firearm in the death of Michael Engram and the shooting of three-year-old D'Andre Dyson. He moves in this Court for *habeas* relief on the ground that his confession, made when he was 15 years old, was involuntary. The following facts are taken from the trial court record and the Illinois Appellate Court's ruling affirming Plummer's conviction on direct appeal. *People v. Plummer*, 714 N.E.2d 63 (Ill. App. Ct. 1999).

### A. Motion to Suppress

Prior to trial, Plummer filed a motion to quash his arrest and suppress his statements to police. At various hearings on the motions, the trial court heard the following testimony.

At 6:30 p.m. on August 18, 1991, Chicago Police Detective Michael Kill ("Kill") was at the scene of a homicide at 5817 S. Union Ave. in Chicago investigating the murder of Anthony Phillips. Kill saw Plummer near the scene, and Plummer provided Kill with information about the Phillips murder. Plummer and Phillips were members of the same street gang and had been together at a party shortly before Phillips was shot to death.

Hours later, at 3:30 a.m. on August 19, Kill was talking with two other witnesses near the scene of the Phillips homicide. Plummer walked by, and Kill asked him and the other witnesses to accompany him to the police station. Kill testified that because Plummer was a juvenile, he drove to Plummer's home to inform his mother that they were going to the station. There, Kill asked the woman who answered the door if she was Plummer's mother. She replied that she was, and Kill told the woman that Plummer had agreed to accompany him to the police station to assist in the Phillips investigation. (The woman turned out to be Plummer's aunt, with whom he was living.)

At the station, Plummer and the other two witnesses were placed in separate interview rooms, and each gave statements about

- 2 -

the Phillips murder. According to police testimony, Plummer was not handcuffed, nor was he read his *Miranda* rights, as he was not a suspect. Detective Kill and Detective John Halloran ("Halloran") interviewed Plummer at about 6:00 a.m. Plummer gave them the name of the man he said shot Phillips, and the officers left the station to pick up the suspect. Halloran testified that he told Plummer and the other witnesses that they could go home, but they would have to return to the station to identify the suspect. Plummer and the other witnesses agreed to remain at the station.

That morning, Detective Stanley Turner ("Turner") got an anonymous telephone call telling him that a man named "Smokey" from 59th Street was responsible for the killing of Michael Engram ("Engram") earlier that month. Engram had been shot to death in a basement candy store at 60th and Morgan streets in Chicago. Turner learned that an individual named "Smokey" from 59th and Union streets, who turned out to be Plummer, was at the station assisting police with a different homicide investigation. Turner met with Plummer, advised him of his *Miranda* rights, and spoke with him for about 15 minutes. Plummer admitted his nickname was "Smokey," but denied having anything to do with the Engram killing. During the interview, Turner said, Plummer was not handcuffed and appeared relaxed. Turner testified that he did not know Plummer's age and did not attempt to contact his parents because Plummer was not in custody.

Later that day, on August 19 at 6:00 p.m., Detective Kill and Detective Kenneth Boudreau again spoke with Plummer about the Phillips murder.  After asking Plummer and the other witnesses if they would remain in the station in case any suspects were found, the officers left the station.  Kill testified that he did not know that Plummer's nickname was "Smokey" or that he was a suspect in the Engram murder.  He denied treating Plummer in an abusive manner and said Plummer never asked to see a lawyer or his mother.  He said Plummer had a good presence of mind and answered all his questions clearly.

At 7:00 p.m., Halloran returned to the police station with food for the witnesses.  While he was talking to two other detectives, they told him they had an eyewitness to the Engram killing and requested that Plummer stand in a line-up.  Halloran denied abusing Plummer and said that Plummer had no difficulty understanding him and did not ask to speak to anyone.  At 8:30 p.m., Plummer stood in a line-up, and the witness identified him as Engram's killer.

Afterward, Plummer was interviewed by Detective Devon Anderson ("Anderson"), who advised him of his *Miranda* rights and that he could be tried as an adult for Engram's murder.  After arresting Plummer, Anderson asked him if he wanted to call his mother.  The detective then tried to reach her, but was unsuccessful.  Then, after speaking with Plummer for 20 minutes, Anderson notified a

- 4 -

youth officer and the felony review unit of the state's attorney's office.

At about 11:15 p.m., Youth Officer Frank McCall ("McCall"), Detective Anderson and Assistant State's Attorney Marback ("Marback") spoke with Plummer. McCall testified that he introduced himself as a youth officer and was present for all subsequent interviews. However, he acknowledged that he did not speak to Plummer about his background or offer to contact a parent for him. Marback testified that he explained that he was not Plummer's lawyer, advised him of his *Miranda* rights, and told him that he could be tried as an adult. After indicating that he understood his rights, Plummer confessed to the Engram murder and agreed to give a handwritten statement.

At 12:35 a.m. on August 20, Marback again advised Plummer of his rights and then wrote out Plummer's statement in his presence. Plummer made corrections to the statement, everyone present initialed the corrections, and then Plummer signed it. Anderson and McCall testified that Plummer appeared to understand their questions and his responses were appropriate. They testified that Plummer never indicated that he had been mistreated, struck, or coerced into giving a statement. Anderson denied taking Plummer's shoes and telling him that they matched prints found at the scene of the Engram murder. McCall testified that he did not ask Plummer if he wanted to speak with a family member because he had been told

by another officer that Plummer's mother had been contacted. McCall testified that at the time of the interview in the Engram investigation, Plummer had 12 prior contacts with police. At 3:50 a.m. on August 20, Plummer gave Marbeck and Halloran a witness statement regarding the Phillips murder.

Plummer testified that between 9:00 and 10:00 a.m. on August 18, 1991, two detectives took him to a police station where he was put in a small room and handcuffed to a ring in the wall. He said Detective Kill did not take him to his mother's house before bringing him to the station, and Plummer did not call his mother while he was at the station. About six hours later, he was taken to the scene of the Phillips homicide. Later, police brought him back to the station and gave him a hamburger. When he asked to go home or to see his mother or a lawyer, Kill laughed, hit him in the face, stomach, and side, and pulled his hair. Another detective came and took his shoes and claimed that the shoes matched the prints from the Phillips murder scene. Another (unnamed) officer told Plummer he would get 40 years in prison, where he would be raped.

Plummer said that he only gave a statement about the Phillips case because he was tired and scared, and he was told he could go home if he made a statement. On cross-examination, Plummer said that he wanted to cooperate in the Phillips investigation because they had been in the same gang. However, when they returned to the

station from the crime scene, Kill and another officer accused him of murdering Phillips. Plummer testified that no one advised him of his rights until the prosecutor advised him of his rights prior to him giving his witness statement in the Phillips case. About a half a day after he gave that statement, Plummer said, Kill hit him repeatedly.

After giving the witness statement in the Phillips case, Plummer said he was put in a line-up and learned that he had been identified as a suspect in the Engram murder. Plummer did not recall police advising him of his rights before talking with him about the Engram case. He did admit, however, that the prosecutor advised him of his rights before he gave a written statement about the case. He said he only signed the written statement because he was tired and afraid. Plummer said that after he was taken to the juvenile temporary detention center, he told the doctor there that police had beaten him. However, he admitted there were no marks on his face in the photos taken of him during the line-up.

Plummer's mother, Jeanette, testified that no one came to her house to tell her that her son was being taken to the police station. She said that her son lived with his aunt upon the recommendation of a doctor who had treated him after he attempted suicide. Jeanette Plummer testified that she was unsure of the date, but thought that police had called her on August 20, 1991, between 8:00 and 9:00 p.m. The officer asked if she was Plummer's

mother, and, when she replied in the affirmative, told her that her son was being held on a murder charge. Plummer then got on the phone and told his mother that "they got me down here on a murder charge." The police officer told Plummer's mother there was no need for her to come to the police station, and she did not. The next day, she visited her son at the juvenile detention center and saw that his back and face were swollen and there were dark marks on his chest. Plummer told her he had been beaten by police. She admitted that the line-up photos did not show any injuries.

The trial court heard conflicting testimony from two mental health experts. Dr. Lawrence Heinrich ("Heinrich"), a clinical psychologist, testified for Plummer. Heinrich said he met with Plummer, performed tests, and reviewed prior medical records. He determined that Plummer suffered from schizo-affective disorder. In his opinion, stress and a prolonged interrogation would cause Plummer to say anything to escape the situation. Heinrich admitted that he did not speak with anyone who knew Plummer prior to his arrest except for his mother. He also admitted that Plummer lied at times. Heinrich was unaware of Plummer's prior contacts with juvenile authorities, two of which ended in probation. Heinrich said that Plummer understood the serious nature of the charges against him.

Dr. Albert Stipes ("Stipes"), a psychiatrist, testified for the State in rebuttal. He testified that he met with Plummer

twice, and after reviewing police reports, Plummer's statements, and his social and psychiatric history, he determined that Plummer could knowingly waive his *Miranda* rights and that he was fit and sane at the time of the incident. Stipes saw no evidence of a schizo-affective disorder. Rather, he believed Plummer was a malingerer who was faking symptoms of mental illness. Stipes said he reviewed the report of another psychologist who also concluded that Plummer was malingering. Stipes testified that in 1984, Plummer had an IQ test that showed he had an IQ of 97.

The trial court denied Plummer's motion to suppress his statements, finding that he had not been physically, psychologically, or emotionally coerced.

## B. Trial

At Plummer's bench trial, a witness named Roger Taylor ("Taylor") testified that at 1:00 p.m. on August 11, 1991, he saw Plummer, who he knew as "Smokey," running toward 60th Street with a gun in his hand. Plummer entered a basement candy store at 60th and Morgan streets, and Taylor heard three gunshots. He then saw Plummer run out of the store and down the street, changing his shirt as he ran.

Reiko Dyson ("Dyson") testified that she was in the candy store with her three-year-old son, D'Andre, and her boyfriend, Engram. As they looked around the store, Plummer walked in and Dyson noticed that he had a gun. Engram turned toward Plummer and

Plummer immediately fired eight or nine shots. Engram, who was unarmed, was shot in the head and chest. D'Andre suffered a wound to one of his fingers.

Assistant State's Attorney Marback testified that Plummer gave a handwritten confession to the Engram murder. In the statement, Plummer said he and Engram belonged to the same street gang and had argued about drugs three days before the shooting. Plummer said Engram threatened him, so he bought a handgun. On August 11, 1991, Plummer went to the candy store with the gun in his waistband. Plummer said that Engram told him he should beat him up and began to walk toward him. Plummer fired five or six shots and fled to an abandoned building, where he hid the gun. After Plummer gave his statement to Marback, Plummer added a paragraph in which he wrote that a man named Aaron Scott had warned him that Engram had put "a hit" on Plummer. Plummer shot Engram because of the "hit."

Plummer was convicted of first-degree murder, attempted murder, and aggravated battery with a firearm. He was sentenced to concurrent prison terms of 50 years, 25 years, and 25 years, respectively.

## C. Post-Trial Proceedings

Following Plummer's conviction, he appealed to the First District Appellate Court. There, he alleged that his confession was involuntary because he was denied access to a family member or anyone else interested in his welfare, and because the

psychological evidence showed he was vulnerable to influence by the police.  The appeals court found that, based on the totality of the circumstances, Plummer's confession was voluntarily made.  *Plummer*, 714 N.E.2d at 74.  The Illinois Supreme Court denied Plummer's petition for leave to appeal.  Plummer's petition alleged that his confession was involuntary because the youth officer who heard his confession abandoned his responsibility to act on Plummer's behalf. The United States Supreme Court denied *certiorari*.

Plummer filed a *pro se* petition for post-conviction relief that raised numerous grounds for relief, including that police physically and psychologically abused Plummer to extract his confession.  The circuit court dismissed the petition, and the appeals court reversed, finding that Plummer's post-conviction counsel failed to present his arguments in the proper legal form. *People v. Plummer*, No. 1-01-0130 (Dec. 31, 2003) (unpublished order).

On remand, Plummer's post-conviction counsel filed a supplemental post-conviction petition.  The circuit court again dismissed the petition without an evidentiary hearing.  The appeals court subsequently affirmed the dismissal of his petition.  *People v. Plummer*, No. 1-06-1552 (June 10, 2009) (unpublished order). Relevant to the instant petition, the appeals court looked to its earlier ruling in Plummer's direct appeal and found that the confession was voluntary.  *Id.* at *28-*32.  The Illinois Supreme

Court denied Plummer's petition for leave to appeal dismissal of his post-conviction petition.

Plummer exhausted his state court remedies and timely filed this petition on September 29, 2010. He raises one claim, that the admission of his confession violated his Fifth and Fourteenth Amendment rights against self-incrimination and to due process because it was involuntary.

## II. **ANALYSIS**

### A. **Procedural Default**

As a preliminary matter, Respondent asserts that Plummer has procedurally defaulted all factual bases underlying his claim except for his argument that Youth Officer McCall's inaction rendered his confession involuntary.

The state's argument boils down to its contention that Plummer was required to present all the reasons he contended his confession was involuntary to each court that reviewed his case through one complete round of state court review. The state argues that because the only factual basis so presented involves the youth officer, Plummer may raise no other bases in support of his claim. In particular, the state argues that Plummer did not fairly present the issue of physical coercion by police to each court that considered either his direct appeal or post-conviction petition.

- 12 -

### 1.  Legal Standard

A petitioner may receive habeas relief only if the state courts have had a "full and fair opportunity" to review the petitioner's constitutional claims. *Farrell v. Lane*, 939 F.2d 409, 410 (7th Cir. 1991).  This means that a petitioner must assert his federal claim through one complete round of state-court review, either on direct appeal or in post-conviction proceedings. *Malone v. Walls*, 538 F.3d 744, 753 (7th Cir. 2008).  In order for the issue to be fairly presented, the petitioner must submit both the "operative facts and the controlling legal principles" to the state court. *Id.*

### 2.  Background

In his direct appeal, Plummer argued that the trial court erred in denying his motion to suppress because he was denied access to his family or a concerned adult, and there was psychological evidence that he was susceptible to influence. Plummer argued that Youth Officer McCall was not a concerned adult because he never consulted with Plummer, either prior to or during the interrogation.  In his petition for leave to appeal to the Illinois Supreme Court, however, Plummer's only alleged ground for reversal was that McCall's inaction rendered his confession involuntary.

On post-conviction review, Plummer argued before the circuit and appeals courts that his conviction was involuntary.  However,

in his counsel-filed petition for leave to appeal to the Illinois Supreme Court, Plummer raised two issues unrelated to voluntariness: his allegations that his lawyer labored under a conflict of interest and failed to fulfill her statutory duties. Petitioner moved for leave to file a *pro se* supplement to that petition that alleged that his confession was obtained through physical and psychological coercion. The Clerk of the Illinois Supreme Court returned these documents to Plummer because he was represented by counsel. Because the court did not accept the documents, the parties dispute whether the involuntariness claim was fairly presented on post-conviction review. However, because this Court finds that Plummer fairly presented the involuntariness claim through one complete round of state court review in his direct appeal, it need not address these arguments.

### 3. Analysis

At its core, the state's procedural default argument boils down to the question of whether Plummer was required to present each factual allegation underlying his claim of involuntariness to each level of the state court system. The Court finds that he was not. The Seventh Circuit's ruling in *Kemp v. Pate*, 359 F.2d 749 (1966), is instructive. There, the petitioner sought *habeas* relief, arguing that his robbery conviction was based on an involuntary confession. *Id.* After the petitioner prevailed in the district court, the state argued on appeal that he had failed to

- 14 -

exhaust his remedies in the state courts because his theory there was based on physical coercion, while in the federal courts he stressed psychological coercion.  *Id.* at 750.  The Seventh Circuit disagreed.  It found that the evidence in the record before the district court was the same as had been considered by the state courts, and the ultimate question — the voluntariness of the confession — was identical.  *Id.* at 751.

Although *Kemp* is a 1966 ruling, it validly states the controlling law on the issue of fair presentment of claims.  *See Miller-El v. Dretke*, 545 U.S. 231, 241 n.2 (2005) (explaining that while evidence underlying claim must be presented to the state courts, theories about that evidence may vary); *Duncan v. Henry*, 513 U.S. 364, 367 (1995) (Stevens, J., dissenting) (citing *Kemp* for the proposition that "Obviously there are instances in which the ultimate question for disposition will be the same despite variances in the legal theory or factual allegations urged in its support.") (internal citations omitted).  It is important to note that whether a confession is voluntary always turns on the totality of circumstances, so all evidence concerning the circumstances of the interrogation is relevant to such a claim.  *Hardaway v. Young*, 302 F.3d 757, 764 (7th Cir. 2002) (citing *Fare v. Michael C.*, 442 U.S. 707, 757–27 (1979)).  Although the case law involving claims that rely upon multiple factual bases is not entirely clear, one leading commentator has aptly observed:  "Particularly in cases in

which the proper analysis of petitioner's legal claim demands that particular legal allegations of error be judged against the totality of the circumstances at trial, and certainly if it appears that the state courts examined the full record in that light, a federal habeas court can properly conclude that the exhaustion doctrine is satisfied." Larry W. Yackle, *Postconviction Remedies*, § 5:10 (Thomson Reuters 2010).

Plummer's *habeas* petition raises several factors that he contends weigh in favor of finding his confession involuntary: (1) his age; (2) his psychological disorders; (3) the absence of the chance to confer with a concerned adult; (4) the duration of time he spent at the police station prior to confessing; and (5) physical coercion by the police. With the exception of supplemental evidence alleging that other individuals have been abused by the same detectives who interrogated Plummer, the evidence underlying all of these allegations is in the trial record. On direct appeal, the Illinois Appellate Court appropriately considered the totality of circumstances, including Plummer's age, his allegations of physical and psychological coercion, the absence of a concerned adult, and the medical evidence indicating that Plummer suffered from schizo-affective disorder. *Plummer*, 714 N.E.2d at 71-73. In his petition for leave to appeal that ruling to the Illinois Supreme Court, Plummer focused on the role of Youth Officer McCall. However, his

statement of facts outlined not only McCall's role (or lack thereof), but Plummer's allegations that he was not allowed to telephone his mother, was struck by Detective Kill, and was told by officers that he would be raped in prison.  The statement also outlined the competing expert testimony by Dr. Stipes and Dr. Heinrich.  If the Illinois Supreme Court had taken the case, it would have had to rule on the voluntariness of Plummer's confession based on the totality of these circumstances.  As such, the Court finds that Plummer presented his involuntariness claim through one complete round of state court proceedings during his direct appeal and has not procedurally defaulted most of the factual bases for his claim.  However, the state is correct that in reviewing Plummer's claim under § 2254(d)(1), this Court may consider only the evidence in the record that was before the state court that adjudicated the claim on the merits.  *Cullen v. Pinholster*, 131 S.Ct. 1388, 1399 (2011).  So the Court may not consider Plummer's evidence, presented for the first time in this Court, of a pattern of police brutality by Detectives Kill and Bourdreau from 1988 to 1991.

### B.  Merits

#### 1.  *Legal Standard*

Under the Antiterrorism and Effective Death Penalty Act (the "AEDPA"), this Court may grant *habeas* relief only if a state court decision is "contrary to, or involved an unreasonable application

of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. § 2254(d)(1),(2); *Etherly v. Davis*, 619 F.3d 654, 660 (7th Cir. 2010).

A decision is "contrary to" federal law when the state court applied a rule that "contradicts the governing law" set forth by the U.S. Supreme Court or if the state court reached a different outcome on facts that are "materially indistinguishable" from those previously before the Supreme Court. *Etherly*, 619 F.3d at 660 (internal citations omitted). A state court's application of clearly established federal law is unreasonable if the court identifies the right standard but applies it unreasonably to the facts before it. *Id.* Additionally, the state court's findings of facts are entitled to deference "unless objectively unreasonable in light of the evidence presented in the state-court proceeding." 28 U.S.C. § 2254(e)(1); *Etherly*, 619 F.3d at 663.

This Court reviews the decision of the last state court to address Plummer's involuntariness argument, which was the Illinois Appellate Court on post-conviction review. *See Watson v. Anglin*, 560 F.3d 687, 690 (7th Cir. 2009). However, as the appeals court largely relied on its earlier ruling on direct appeal, both rulings are relevant to the Court's analysis.

- 18 -

## 2. Analysis

As noted above, the relevant federal law that the state courts were required to apply in this case is whether, in light of all the circumstances, Plummer's confession was a product of his own voluntary choice. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). Although juvenile defendants are treated with "special caution," *In re Gault*, 387 U.S. 1, 45 (1967), the same test applies in evaluating the voluntariness of their statements. *Fare*, 442 U.S. at 725.

In applying this test, the relevant factors include "the juvenile's age, experience, education, background, and intelligence, and . . . whether he ha[d] the capacity to understand the warnings given to him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights." *Etherly*, 619 F.3d at 661 (quoting *Fare*, 442 U.S. at 725). Courts also should consider the length of the interrogation, the absence of a parent or friendly adult, and whether police coercion or intimidation has tainted the confession. *Etherly*, 619 F.3d at 661. Here, the Illinois Appellate identified and applied the correct standard. *Plummer*, 714 N.E.2d at 70. However, Plummer argues that, in light of the evidence he presented, the state court unreasonably applied the precedent of the United States Supreme Court, particularly *Gault*, 387 U.S. 1, *Haley v. Ohio*, 332 U.S. 596 (1948), and *Gallegos v. Colorado*, 370 U.S. 49 (1962). However,

this is a difficult showing to make because reasonable jurists may disagree, and the state court's ruling must stand "if it is one of several equally plausible outcomes." *Hall v. Washington*, 106 F.3d 742, 748-49 (7th Cir. 1997).

Further, although the trio of cases relied on by Plummer is somewhat helpful to his case, later developments in the law lessen their usefulness. In fact, in several recent cases the Seventh Circuit has denied habeas relief in circumstances similar to the ones present here. For example, in *Etherly*, 619 F.3d at 662-64, the Seventh Circuit denied relief where the 15-year-old defendant was of limited intelligence and had little experience with police, but was not coerced and repeatedly indicated that he understood his rights. Similarly, in *Ruvalcaba v. Chandler*, 416 F.3d 555, 561-62 (7th Cir. 2005), the Seventh Circuit that the Illinois Appellate Court reasonably applied federal law to find voluntary the confession of a 16-year-old defendant who was detained for up to 14 hours and who testified that police threatened to jail his girlfriend if he did not confess to the crime. Finally, in *Hardaway*, 302 F.3d at 765, the Seventh Circuit expressed misgivings about the fact that a 14-year-old defendant was questioned for a long period of time without a friendly adult, but ultimately found the state court's judgment of voluntariness to be reasonable where there was no evidence of coercion and the defendant had extensive experience with the criminal justice system.

In rejecting Plummer's involuntariness claim on post-conviction review, the Illinois Appellate Court noted that in its ruling on direct appeal, it had reviewed all the pertinent facts and determined that the trial judge's ruling on the motion to suppress was not against the manifest weight of the evidence. *People v. Plummer*, 1-06-1552, at 32. Because the standard of review had since changed to *de novo*, the court reconsidered its earlier ruling in light of that standard, but nonetheless found that the confession was voluntary. *Id.*

In its ruling on direct appeal, the Illinois Appellate Court considered the relevant facts. It noted that Youth Officer McCall took a passive role in the investigation, but also noted that, under Illinois law, the presence of a youth officer was not required before or during the questioning of a minor. *Id.* at 71-73. The Court considered the fact that Plummer's mother was not present during the interrogation, and found that her absence weighed in favor of Plummer's argument. *Id.* at 71.

The court also considered the circumstances of Plummer's interrogation, including that Plummer was originally brought to the station not as a suspect, but as a witness. *Id.* And it noted that Plummer's timeline of events was inconsistent with the police reports taken in the case. *Id.* The appeals court also credited the trial judge's finding that there was no evidence that police coerced Plummer, either physically, emotionally or psychologically.

*Id.* Finally, the appeals court considered the evidence Plummer had presented as to his psychological disorders. It found that the trial court was not required to accept the testimony of Plummer's expert that Plummer suffered schizo-affective disorder over the contrary testimony of the state's expert. *Id.* at 73. In light of all these circumstances, the appeals affirmed the trial judge's finding that Plummer's confession was voluntarily made. *Id.*

Plummer attacks this ruling on two fronts. First, he argues that certain of the state court findings were unreasonable. But, as noted above, the state court's findings of facts are presumed correct and this presumption may be rebutted only by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). First, Plummer challenges the appeals court's finding that his confession was not the result of psychological coercion. *Plummer*, 714 N.E.2d at 73. Plummer contends that his history of mental illness compels a different result, but he does not present clear and convincing evidence to undermine the state court's reliance on Dr. Stipes' opinion that Plummer was exaggerating his symptoms. *See Etherly*, 619 F.3d at 663 (holding that district court must defer to presumptively reasonable reliance by state courts on expert's finding that juvenile understood his rights). Further, the trier of fact was entitled to credit the police testimony that Plummer was relaxed, coherent, and able to understand his rights during the

interrogation. As such, this Court will not substitute its judgment for that of the Illinois courts.

As to the other factors underlying the voluntariness test, the Court notes that although Plummer was at the station for a lengthy period of time, most of that time was spent on the Phillips homicide, in which Plummer was not a suspect. Further, police gave Plummer food and cigarettes and allowed him to use the bathroom. It also is significant that Plummer had 12 prior contacts with police, was given his *Miranda* rights on multiple occasions, and said that he understood them. Although Plummer challenges the trial court's finding that Plummer was not physically abused as objectively unreasonable, this is clearly not the case where even Plummer and his mother indicated that photographs of Plummer taken during the police line-up showed no injuries. Nor did Plummer present any medical evidence supporting his claims. Finally, although the record shows that Youth Officer McCall did little to protect Plummer's rights, that factor is but one in the analysis, and it was considered by the Illinois Appellate Court. Because the state court's conclusion that Plummer's confession was voluntary was "at least minimally consistent with the facts and circumstances of the case," this Court must deny habeas relief. *Taylor v. Bradley*, 448 F.3d 942, 948 (7th Cir. 2006) (internal citation omitted).

## C. Certificate of Appealability

Because this Court has denied Plummer's petition, it must also consider whether to issue a certificate of appealability. *See* Rule 11(a) of the Rules Governing Section 2254 Cases. This requires that the applicant make a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). In order to make this showing, the applicant must show that reasonable jurists would find the district court's assessment of the constitutional claims to be debatable or wrong. *Slack v. McDaniel,* 529 U.S. 473, 484 (2000). Because the Court finds that the relevant case law clearly compels the result reached here, the Court declines to issue a certificate of appealability.

## III. <u>CONCLUSION</u>

For the reasons stated herein, Plummer's Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 is denied, and the Court declines to issue a Certificate of Appealability.

**IT IS SO ORDERED.**

_____
Harry D. Leinenweber, Judge
United States District Court

**DATE:** 9/1/2011

- 24 -